COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                       NOS.  2-08-050-CR

       
2-08-051-CR

 

 

JOE W. DICKSON                                                                APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 371ST
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

Joe W. Dickson appeals his convictions for
aggravated sexual assault and aggravated kidnapping.  In nine points, he challenges the factual
sufficiency of the evidence to support his convictions, asserts unanimity and
double jeopardy violations, and argues that the trial court erred by denying
his motion for the State to make an election. 
We affirm.








                                            Background

A grand jury indicted Appellant for the
aggravated sexual assault of complainant Ora 
W. and the aggravated kidnapping of complainant AAdam@ (a
pseudonym) on or about October 4, 2006. 
Appellant pleaded not guilty, and the cases were tried to a jury.

Ora testified that in October 2006, she shared a
home with her four-year-old nephew, Adam; her two daughters, Beatrice and Carol
(both pseudonyms); and Appellant, who had been her boyfriend until a few months
earlier.  She said that on the morning of
October 4, Appellant punched her in the stomach with his fistCcausing
bruises that were visible in photographs taken a couple of days later and
admitted into evidence at trialCand she
fell to the ground screaming.  Appellant
bound her wrists with plastic zip ties and dragged her to the bedroom.  According to Ora, when Adam followed them to
the bedroom, Appellant pushed him into the closet and said, AStay in
the closet because I don=t want you to see me kill your
aunt.@  Ora testified that Appellant then tore her
underwear off, laid a shotgun on the bed, threatened her with a knife or box
cutter, and attempted to penetrate her anus with his penis.  When his attempt failed, Appellant forced her
to perform oral sex on him until he ejaculated in her mouth, all while holding
the box cutter to her throat.








Ora testified that Appellant then told her to Astart
praying to God to save [her] life soul.@  Appellant gagged Ora with a shirt and tape,
tied her legs with an electrical cord, and told her that if her sister came to
the door, he would Ablow her head off.@  After about three hours, Appellant released Ora
and told her to take a bath, and she showered while Appellant stood in the
bathroom doorway.  Ora testified that
Appellant told her he was sorry but that he would kill her if she told anyone
what he had done.  She said that despite
his threat, she went to her sister Brenda Jackson=s house
next door while Appellant remained at home, and Ora told Brenda and Brenda=s
daughter, Sametra Jackson, what Appellant had done.








Ora and Appellant then went to pick up Beatrice
and Carol at school.  Ora said that upon
their return, she, Appellant, Adam, and Beatrice sat in the garage, which was
furnished with a couch.  While they were
sitting there, a friend of Ora=s named
Tonya Gilstrap drove up, jumped out of her car, and said, AYou mean
this mother-f***** still here after what he done to you?@  Ora did not see a gun in Tonya=s
hands.  Ora said that she walked toward
Tonya while saying that Appellant had not done anything to her because she was
afraid Tonya would start a fight with Appellant.  Ora then walked into Brenda=s house
to get away from Appellant while Brenda called for Adam and Beatrice to go to
her house, too.  She testified that
Beatrice grabbed Adam but that Appellant pulled Adam away from her and carried
him into Ora and Appellant=s house.

Ora said that she then saw Appellant raise his
shotgun and start shooting, so she climbed out of a window in Brenda=s house,
jumped a neighbor=s (ACuttie=s@) fence,
and sought refuge in Cuttie=s
garage.  She heard Aquite a
few@ more
gun shots.  Eventually, police arrived
and evacuated everyone from the area.   








Ora=s niece
Sametra Jackson testified that she; her boyfriend, Rudy Johnson; and her
mother, Brenda Jackson, were all in Brenda=s house
on the day of the incident when Ora came to the house around noon.  Ora was jittery and upset.  Ora talked to Sametra and the others for
fifteen minutes and then returned to her own house.  Sametra said she was concerned and afraid for
Ora.  According to Sametra, after Ora
left, Brenda made a telephone call to someone. 
A short while later, Sametra saw Tonya drive up, get out of her car, and
walk up to Ora=s house.  She did not see a gun in Tonya=s
hand.  When Sametra and Brenda called to
the children to get away from Ora=s house;
Beatrice ran off down the street, and Sametra chased after her.  Sametra said she then heard a gunshot and ran
into Cuttie=s house.  She heard more gun shots but did not see who
was shooting and did not see anyone get hit by gunfire.  She later saw gunshot wounds on Cuttie,
Tonya, and Rudy.  She said Rudy lost his
right eye and two teeth and still has buckshot embedded in his chest.

Brenda Jackson testified that after Ora told her
and Sametra what Appellant had done to her, she called Tonya Gilstrap and told
her what Ora had said.  Tonya drove up
five or ten minutes later, got out of her car, and spoke to Appellant, who was
sitting in his garage with the garage door open.  She did not see a gun in Tonya=s
hands.  Brenda testified that she yelled
to Appellant, AYou wrong for what you did,@ and
called Adam and Beatrice to come to her because she was concerned about what
Appellant might do when he found out Brenda and Tonya knew what he had done to
Ora.  She said that Beatrice came out of
the garage, and Appellant grabbed Adam and took him inside the house.  Brenda ran into her own house.  She then heard several gunshots.  Brenda testified that Rudy was hit with
gunfire and that Tonya, after helping to move Rudy into Brenda=s house,
went back outside and got shot, too. 
Brenda called 911; after listening to the 911 tape, she testified that
she called 911 before the shooting started. 
Police eventually evacuated her and the other people in her house.  She did not see Adam again until around 7:00
a.m. the following day.








Rudy Johnson testified that when Tonya drove up,
she jumped out of her car and screamed at Appellant.  Rudy did not see anything in Tonya=s
hands.  Rudy told Tonya to calm down and
told Adam and Beatrice to come out of the garage.  Beatrice ran down the street, and Appellant
grabbed Adam.  Rudy testified that he and
Tonya tried to rescue Adam from Appellant, but Appellant ran inside the house
with Adam and closed the door.  Rudy saw
a cell phone on the floor of Appellant=s
garage, picked it up, and called the police as he walked out of the
garage.  He heard a gunshot fired from a
window of Appellant=s house and, as he walked toward
Brenda=s house,
a second shot hit him in the face.  Rudy
took shelter in Brenda=s house until the police came
and evacuated him from the area.








Kevin ACuttie@ Willis
testified that he lived in the house next door to Brenda=s;
Appellant and Ora lived in the house on the other side of Brenda=s.  He was sitting in his garage when he saw
Tonya drive up, get out of her car, and start Acussing@
Appellant, who was in his garage with Ora and some children.  He testified that Tonya had a pistol in her
hand.  He saw Ora come out of the garage
and say, AGirl, what [are] you talking
about?@  Appellant grabbed Adam, and then Tonya and
Rudy ran up into Appellant=s
garage.  Cuttie did not see Tonya point
her pistol or fire it.  Tonya and Rudy
came back out of Appellant=s
garage, and Cuttie saw Rudy get shot. 
Cuttie said he went into his house to get his own gun, returned to his
garage, and fired two shots in the air towards Appellant=s house
to give the children in the area time to take cover.  He saw Tonya come out of Brenda=s house
and cross the yard to his house; then he and Tonya were both shot.  Cuttie said his friend Ernest Cary, who was
also in Cuttie=s garage, then grabbed Cuttie=s gun
and fired additional shots at Appellant=s
house.  Police later evacuated Cuttie
through the back of his property.

Forest Hill Police Detective Demond Spraberry
testified that he was dispatched to the scene of the incident.  He said that the Everman Police Department,
the Tarrant County Constable=s
Office, the Fort Worth Police Department and SWAT team, the Burleson SWAT team,
and the Mansfield SWAT team all assisted with the incident because the Forest
Hill Police Department was not equipped to deal with a hostage situation.  Detective Spraberry and other officers set up
a security perimeter around the area and evacuated area homes by taking the
residents into a field behind the houses. 
Detective Spraberry helped evacuate Brenda=s house,
and he said four people in the house were injured:  Rudy, Tonya, and CuttieCall of
whom had gunshot woundsCand Ora, who had bruises on her
stomach, wrists, and ankles.








Mansfield SWAT officer Timothy Wing testified
that he and his SWAT team arrived on the scene around 11:20 p.m.  He said that around sunup on the following
day, Appellant walked out of his house under a negotiated Asurrender
plan@, and
the SWAT team arrested him.  Officer Wing
then entered the house with other members of his team and searched the house
until they found Adam, who was scared but unharmed.

Forest Hill crime scene officer Richard Kyle
arrived at the scene after Appellant surrendered and the crime scene was
secure.  During his search of Appellant=s house,
he found evidence of several shotgun shots fired from inside the house, a
shotgun, severed electrical cords, and a pair of torn panties, which Ora
identified as the ones she was wearing at the time of the assault.

Mansfield Police Officer Daniel Sherwin testified
that he negotiated with Appellant via a telephone the SWAT team tossed into
Appellant=s house through a window.  Appellant told him, AThe boy
is not coming out.@ 
Officer Sherwin eventually developed a surrender plan with Appellant,
and Appellant surrendered.








Appellant called Ernest Cary as a witness.  Cary testified that he saw a woman drive up
and get out of her car with a pistol in her hand.  He said that he saw the lady and Rudy run
into Appellant=s garage and chase Appellant into
his house.  Cary saw Appellant grab Adam
and said he thought Appellant did so to protect himself from Tonya, though he
later testified that A[i]t=s not
like he was holding the baby up . . . so if she shot, the baby would be the
first one to get hit.  It wasn=t
[anything] like that.@ 
He said Appellant fired the first shot, and he never saw Tonya point or
fire her pistol.  Cary testified that he
fired Cuttie=s gun A[s]o
that [Appellant would] quit shooting [and they could] get the kids, because
there=s like
kids everywhere.@

The jury convicted Appellant of aggravated
kidnapping and aggravated sexual assault. 
After hearing punishment-phase testimony, the jury assessed punishment
at seventeen years= confinement on the aggravated
kidnapping conviction and eleven years=
confinement on the aggravated sexual assault conviction, and the trial court
sentenced Appellant accordingly.

                                             Discussion

1.     Factual Sufficiency

In his first three points, Appellant challenges
the factual sufficiency of the evidence to support his convictions.








When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Neal v.
State, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); Watson v. State,
204 S.W.3d 404, 414 (Tex. Crim. App. 2006). 
We then ask whether the evidence supporting the conviction, although
legally sufficient, is nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Lancon v. State, 253
S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.

a.      Sexual Assault

In his second point, Appellant argues that the
evidence is factually insufficient to support his aggravated sexual assault
conviction because Ora=s testimony regarding the
assault was uncorroborated; her testimony Ais
self-contradictory on multiple occasions@; and
her testimony about her actions following the assaultCgoing to
Brenda=s house,
returning to Appellant=s house, and accompanying
Appellant to pick up the children at schoolCis Aincredible.@








The lack of physical or forensic evidence is
merely a factor for the jury to consider in weighing the evidence.  See Lee v. State, 176 S.W.3d 452, 458
(Tex. App.CHouston [1st Dist.] 2004), aff=d, 206
S.W.3d 620 (Tex. Crim. App. 2006).  It is
not needed to corroborate the complainant=s
testimony.  See Tex. Code Crim.
Proc. Ann. art. 38.07 (Vernon 2005); see also Glockzin v. State, 220
S.W.3d 140, 148 (Tex. App.CWaco
2007, pet. ref=d) (holding that when victim testified
to facts establishing aggravated sexual assault, lack of physical or forensic
evidence did not demonstrate factual insufficiency).  Further, the physical evidence in this caseCthe
bruises on Ora=s abdomen, wrists, and ankles
and the torn panties and severed electrical cords found in her bedroomCdid
corroborate Ora=s account of the assault.

Concerning the alleged inconsistencies in Ora=s
testimony, a jury is free to believe or disbelieve the testimony of any witness
and to reconcile conflicts in the testimony. 
Bottenfield v. State, 77 S.W.3d 349, 355 (Tex. App.CFort
Worth 2002, pet. ref=d), cert. denied, 539
U.S. 916 (2003).  A jury confronted with
conflicting evidence may elect to believe one witness and disbelieve others and
may resolve inconsistencies in the testimony of any witness. Cain v. State,
958 S.W.2d 404, 408B09 (Tex. Crim. App. 1997).  In this case, the jury resolved any
inconsistencies in Ora=s testimony against Appellant,
and it was free to do so.  See id.  And to the extent that the jury determined
that Ora=s
actions following the assault were not Aincredible,@ as
Appellant contends, we cannot say that their determination was against the
great weight and preponderance of the evidence. 
We therefore overrule Appellant=s second
point.

b.     Kidnapping








In his first point, Appellant argues that the
evidence is factually insufficient to support his conviction for aggravated
kidnapping because he did not sexually assault Adam, the evidence shows that he
did not use Adam as a shield but instead attempted to protect him from the
gun-wielding Tonya, and he did not Asecrete@ Adam
because everyone knew Adam was in Appellant=s home.

A person commits the offense of aggravated
kidnapping if he intentionally or knowingly abducts another person with the
intent to use him as a shield or hostage or facilitate the commission of a
felony or the flight after the commission of a felony.  Tex. Penal Code Ann. ' 20.04
(Vernon 2003).  AAbduct@ means
to restrain a person with intent to prevent his liberation by secreting or
holding him in a place where he is not likely to be found or using or
threatening to use deadly force.  Id.
'
20.01(2) (Vernon Supp. 2008).  ARestrain@ means
to restrict a person=s movement without consent, and
restraint is Awithout consent@ when
accomplished by any means if the victim is a child under fourteen years of age
and the parent or guardian has not acquiesced in the confinement.  Id. '
20.01(1).

The indictment alleged that Appellant

with the intent to use
[Adam] as a shield or hostage or facilitate the commission of a felony, to wit:
aggravated sexual assault, or to facilitate the flight after the attempt or
commission of said felony, intentionally or knowingly abduct[ed] [Adam] by
restraining [him] without consent by moving [him] from one place to another or
confining [him] with the intent to prevent [Adam=s] liberation . . . by
using or threatening to use deadly force, namely by shooting a firearm at Rudy
Johnson who was trying to rescue [Adam] or by shooting a firearm at Tonya
Gilstrap who was trying to rescue [Adam] or by firing a firearm out the window
of his home.

 








The court=s charge tracked the indictment.


The evidence presented at trial showed that when
Tonya confronted Appellant over his sexually assaulting Ora, he grabbed Adam,
retreated into his house, and opened fire on Tonya and Rudy with a
shotgun.  The jury could reasonably
believe that Appellant restrained Adam=s
liberty by using deadly force with the intent to facilitate his flight after
having sexually assaulted Ora. 
AlternativelyCif the jury believed that Tonya
was holding a pistol when she confronted AppellantCthe jury
could reasonably conclude that Appellant restrained Adam=s
liberty by using deadly force with the intent to use Adam as a shield or
hostage.  The jury could reasonably reach
the same conclusion based on the evidence that after shooting Rudy, Tonya, and
Cuttie, Appellant barricaded himself in his house for hours and refused to
release Adam.

Thus, the State was not required to prove that
Appellant intended to or did sexually assault Adam.  Nor was the State required to prove that
Appellant secreted Adam; the indictment alleged both alternative definitions of
Aabduct@Csecreting
or using or threatening to use deadly forceCand
there was ample evidence that Appellant used deadly force when he fired a
shotgun at Rudy, Tonya, and Cuttie.








We cannot say that the evidence supporting the
conviction is so weak that the jury=s
verdict is clearly wrong and manifestly unjust or that the conflicting evidence
so greatly outweighs the evidence supporting the conviction that the jury=s
verdict is manifestly unjust.  See
Lancon, 253 S.W.3d at 704; Watson, 204 S.W.3d at 414B15,
417.  We therefore hold that the evidence
is factually sufficient to support Appellant=s
conviction for aggravated kidnapping, and we overrule Appellant=s first
point.

c.      Whether Appellant voluntarily released
Adam in a safe place

In his third issue, Appellant argues that the
greater weight and preponderance of the credible evidence shows that he
voluntarily released Adam in a safe place. 
At the punishment stage of trial, a defendant convicted of aggravated
kidnapping may raise the issue as to whether he voluntarily released the victim
in a safe place.  Tex. Penal Code Ann. ' 20.04(d).  If the defendant proves the issue by a
preponderance of the evidence, the offense is a felony of the second degree,
rather than the first degree.  Id.  The burden to demonstrate the safe release
lies with the defendant under section 20.04(d). 
Teer v. State, 923 S.W.2d 11, 15 n.4 (Tex. Crim. App. 1996).








When evaluating the factual sufficiency of the
evidence offered to support the denial of an affirmative defense, or any fact
issue where the law has shifted to the defendant the burden of proof by a
preponderance of the evidence, the correct standard of review is whether after
considering all of the evidence relevant to the issue, Athe
judgment is so against the great weight and preponderance of the evidence so as
to be manifestly unjust.@ 
Gallo v. State, 239 S.W.3d 757, 770 (Tex. Crim. App. 2007)
(quoting Meraz v. State, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990)), cert.
denied, 128 S. Ct. 2872 (2008).

Appellant requested a punishment-phase jury
instruction on voluntary release, which the trial court denied, citing Brown
v. State, 98 S.W.3d 180 (Tex. Crim. App. 2003).  That denial forms the basis of Appellant=s fourth
point.  Upon timely request, an accused
is entitled to an affirmative defense instruction on every issue raised by the
evidence, whether it is strong, feeble, unimpeached, or contradicted, and even
if the trial court is of the opinion that it is not entitled to belief.  Warren v. State, 565 S.W.2d 931, 933B34 (Tex.
Crim. App. 1978).








In Brown, the court of criminal appeals
extensively analyzed the meaning of Avoluntarily@ under
section 20.04(d).  98 S.W.3d 183B88.  The court rejected a broad interpretation of Avoluntarily@ in
favor of a narrow interpretation, Asuch as
the absence >of rescue by the police [or
others] or escape by the [kidnap] victim.=A  Id. at 188 (quoting Model Penal Code ' 212.1
cmt. at 233B34) (providing requirement that
release be Avoluntary@ means
that Arescue
by the police or escape by the victim@ will
not reduce the punishment level of the offense).  AThe
cases determining when a kidnapper voluntarily releases the victim in a safe
place require the kidnapper to release the victim without any element of rescue
or escape.@ 
Cooks v. State, 169 S.W.3d 288, 291 (Tex. App.CTexarkana
2005, pet. ref=d).  When a victim is released or abandoned as a
result of police intervention or confrontation, the defendant=s
conduct likely will not rise to the level of Avoluntary
release@ under
section 20.04(d).  See Ballard v.
State, 193 S.W.3d 916, 919 (Tex. Crim. App. 2006) (holding appellant=s
leaving victim in car with keys did not voluntarily release victim; victim did
not escape until police intervened); LaHood v. State, 171 S.W.3d 613,
624B25 (Tex.
App.CHouston
[14th Dist.] 2005, pet. ref=d)
(holding defendant not entitled to safe-release instruction when he released
victim only after police stopped his vehicle); Fowler v. State, 958
S.W.2d 853, 860 (Tex. App.CWaco
1997), aff=d, 991
S.W.2d 258 (Tex. Crim. App. 1999) (holding defendant did not voluntarily
release victim when he surrendered after forty-five-minute standoff with
police, leaving victim unharmed in motel room); Oestrick v. State, 939
S.W.2d 232, 238B39 (Tex. App.CAustin
1997, pet. ref=d) (holding defendant=s
abandoning victim in his truck in an attempt to escape after being surrounded
by police was not voluntary release). 
Such circumstances are more analogous to a rescue or escape and will
prohibit a finding of voluntary release. 
See Brown, 98 S.W.3d at 188.








In this case, Appellant contends that there was
some evidence that he voluntarily released Adam.  The record does not support his
contention.  The undisputed evidence
shows that Appellant refused to release Adam even when confronted by the police
departments and SWAT teams of several municipalities.  Appellant continued to hold Adam until hours
of negotiation resulted in Appellant=s
surrender.  To say that Appellant
voluntarily released Adam would require the broadest possible interpretation of
Avoluntarily@Can
interpretation the court of criminal appeals specifically rejected in Brown.  See id.

We hold that there is no evidence that Appellant
voluntarily released Adam.  Therefore,
the trial court did not err by refusing to give the jury a section 20.04(d)
instruction.  See Warren, 565
S.W.2d at 933B34.  And absent any evidence of voluntary release,
the judgment is not so against the great weight and preponderance of the
evidence as to be manifestly unjust.  See
Gallo, 239 S.W.3d at 770.  We
therefore overrule Appellant=s third
and fourth points.

2.     Jury Unanimity








In his fifth and sixth points, Appellant argues
that he was Adenied double jeopardy
protection . . . in that he was denied a unanimous verdict@ in both
cases.  Appellant mentions double
jeopardy only in the headings for these two issues; his argument focuses solely
on jury unanimity and does not explain how he was Adenied
double jeopardy protection.@  Therefore, we will analyze his fifth and
sixth issues as raising unanimity and not double jeopardy.








Jury unanimity is required in all criminal
cases.  Ngo v. State, 175 S.W.3d
738, 745 (Tex. Crim. App. 2005).  The
jury must agree that the defendant committed one specific crime.  Landrian v. State, 268 S.W.3d 532, 535
(Tex. Crim. App. 2008).  That does not
mean, however, that the jury must unanimously find that the defendant committed
that crime in one specific way or even with one specific act.  Id. 
The unanimity requirement is not violated when the jury is
instructed on alternative theories, or manner and means, of committing the same
offense.  De Los Santos v. State,
219 S.W.3d 71, 76 (Tex. App.CSan
Antonio 2006, no pet.); Cook v. State, 192 S.W.3d 115, 118 (Tex. App.CHouston
[14th Dist.] 2006, no pet.).  Texas
courts have long held that the State may plead alternate Amanner
and means@ of the commission of the same
offense.  See Willis v. State, 34
Tex. Crim. 148, 149, 29 S.W. 787, 788 (1895). 
An indictment may contain as many paragraphs as are necessary to allege
the various manner and means of committing one alleged offense.  Callins v. State, 780 S.W.2d 176, 182C83 (Tex.
Crim. App. 1986), cert. denied, 497 U.S. 1011 (1990).  If the statute in question establishes
different manner and means by which the offense may be committed, unanimity is
generally not required on the alternate manner and means of the offense=s
commission.  Jefferson v. State,
189 S.W.3d 305, 312 (Tex. Crim. App. 2006).

Appellant argues that Athe jury
was required to find at least 1 of the following 4 scenarios in order to
convict@ him of
aggravated kidnapping and sets out a page-long list of the different possible Ascenarios@ the
jury could find based on the disjunctive Amanner
and means@ allegations set out in the
indictment and repeated in the jury charge. 
In Gonzales v. State, the Amarillo Court of Appeals rejected a similar
argument.  270 S.W.3d 282, 288B89 (Tex.
App.CAmarillo
2008, pet. ref=d).  The Gonzales court held that although
an indictment for aggravated kidnapping alleged several alternative aggravating
factors but alleged only one victim and sought only one conviction for
aggravated kidnapping, jury unanimity was not required as to the aggravating factors:








By virtue of being a
result‑oriented offense, we conclude that the allowable unit of
prosecution for the offense of aggravated kidnapping relates to the abduction
of a victim.  In other words, the State
is allowed to prosecute a person for each victim kidnapped, not for the number
of aggravating factors that may be present. 
In this case, the State alleged one victim and has sought only a single
conviction for the offense of aggravated kidnapping, regardless of the number
of aggravating factors alleged in Count I. 
Therefore, the trial court did not err in instructing the jury that it
could consider all of the aggravating factors alleged by the State and return a
general verdict of guilty for the offense of aggravated kidnapping.

 

Id.

The Gonzales court=s
analysis applies with equal force to our case. 
The indictment charged several alternative means of committing
aggravated kidnapping but sought conviction for a single kidnapping of a single
victim.  The charge required juror
unanimity on the gravamen of the offense, namely, that Appellant abducted Adam
with the intent to prevent his liberation; the disjunctive portions of the
charge pertain only to the means and manner of committing the offense and the
aggravating circumstances.   The trial
court did not err by submitting the alternative means and aggravating factors
to the jury disjunctively, and such submission did not deprive Appellant of a
unanimous verdict.  See id.  We overrule Appellant=s fifth
point.

Appellant=s sixth
point pertains to his conviction for aggravated sexual assault.  His entire argument consists of three
sentences in which Appellant contends that Athe jury
in order to find a conviction had to [wade] through a sea of >or=
(physical force or violence, commit or threaten, knife
or gun).@ 









A person commits sexual assault if the person
intentionally or knowingly causes the penetration of the mouth of another
person by the sexual organ of the actor without that person=s
consent.  Tex. Penal Code Ann. ' 22.011(a)(1)(B)
(Vernon Supp. 2008).  A sexual assault is
without consent if the actor compels the person to submit or participate by the
use of physical force or violence or by threatening to use force or violence
and the other person believes that the actor has the present ability to execute
the threat.  Id. ' 22.011(b)(1),
(2).  The same act rises to the level of
aggravated assault if the actor uses or exhibits a deadly weapon.  Id. '
22.021(a)(1)(A)(ii), (2)(A)(iv) (Vernon Supp. 2008).  

The indictment alleged that Appellant

did intentionally or
knowingly cause the penetration of the mouth of [Ora] by inserting defendant=s penis in [Ora=s] mouth without the
consent of [Ora] by compelling [Ora] to submit or participate by the use of
physical force or violence or by threatening to use force or violence against
[Ora] and [Ora] believed that the defendant had the present ability to execute
said threat, and the defendant used or exhibited a deadly weapon, to-wit: a
shotgun, in the course of the same criminal episode.

 

Paragraph Two: And it is
further presented . . . that the defendant did . . . intentionally or knowingly
cause the penetration of the mouth of [Ora] by inserting defendant=s penis in [Ora=s] mouth without the
consent of [Ora] by compelling [Ora] to submit or participate by the use of
physical force or violence or by threatening to use force or violence against
[Ora] and [Ora] believed that the defendant had the present ability to execute
said threat, and the defendant used or exhibited a deadly weapon, to-wit: a box
cutter, that in the manner of its use or intended use was capable of causing
death or serious bodily injury, in the course of the same criminal
episode.   

 








The court=s charge tracked the
indictment.  Thus, the indictment alleged
that Appellant sexually assaulted Ora by inserting his penis into her mouth and
compelled her to submit or participate through (1) the use of force or violence
or (2) the threat of force or violence. 
As the aggravating factor, the indictment alleged that Appellant
exhibited or used either (1) a shotgun or (2) a box cutter.  The court=s charge
tracked the language of the indictment.

As with aggravated kidnapping, the charge
required juror unanimity on the gravamen of a single offense:  Appellant=s
penetrating Ora=s mouth with his penis without
Ora=s
consent.  The jury could disagree about
the Amanner
and means@ disjunctive elements in the
chargeCAppellant=s mental
state, how he overcame Ora=s lack
of consent, and what deadly weapon Appellant used Cbut it
could convict Appellant only if it unanimously agreed that he committed a
single act, namely, that he penetrated Ora=s mouth
with his penis without her consent, and each juror concluded that at least one
of the aggravating factors exists. See Jefferson, 189 S.W.3d at
312.  Juror unanimity was not required as
to which of the aggravating factors exists. 
See Landrian, 268 S.W.3d at 533, 539 (AThe jury
did not have to be unanimous on the aggravating factors . . . .  Because the aggravated‑assault statute
defines two or more [aggravating] circumstances or factors . . ., the defendant
may be convicted if each juror concludes that at least one of the aggravating
factors or elements exist.@).  Thus, the aggravated sexual assault charge
did not violate the constitutional unanimity requirement, and we overrule
Appellant=s sixth issue.








3.     Election

In his seventh and eighth points, Appellant
argues that the trial court erred by denying his motion for the State to make
an election with regard to both offenses. 
At the conclusion of the State=s
case-in-chief, Appellant requested an election as to the A[m]anner
and means of commission of the offense@ the
State intended to rely on for conviction.








Upon a timely motion by the defendant, the State
is required to make an election of those alleged acts upon which it will rely
to pursue a conviction.  Renteria v. State,
199 S.W.3d 499, 507 (Tex. App.CHouston
[1st Dist.] 2006, pet. ref=d)
(citing Gutierrez v. State, 8 S.W.3d 739, 748 (Tex. App.CAustin
1999, no pet.)).  This election
requirement applies, however, only if an indictment alleges a single offense
and the proof at trial shows the alleged offense occurred more than once.   Id. (citing Scoggan v. State,
799 S.W.2d 679, 680 n.3 (Tex. Crim. App. 1990); Moore v. State, 143
S.W.3d 305, 312 (Tex. App.CWaco 2004,
pet. ref=d)).  The State is not required to elect between
separate manner and means of committing the same offense.  Id. at 507B08
(citing Rodriguez v. State, 970 S.W.2d 66, 69 (Tex. App.CHouston
[14th Dist.] 1998, pet. ref=d) (AThe
State may plead all three forms of delivery [of cocaine,] and it may not be
forced to elect a particular method on which to prosecute.@); Braughton
v. State, 749 S.W.2d 528, 530 (Tex. App.CCorpus
Christi 1988, pet. ref=d) (AThe
State need not elect between various theories alleged and the jury may consider
all theories and return a general verdict of guilty.@), cert.
denied, 493 U.S. 870 (1989)).

As we noted in our analysis of Appellant=s
unanimity points, each indictment alleged a single criminal act but multiple
manner and means theories.  Because each
indictment alleged a single criminal act, the State was not required to elect
between the various manner and means theories. 
See id.  We overrule
Appellant=s seventh and eighth issues.

4.     Double jeopardy

In his ninth point, Appellant argues that his
convictions subjected him to double jeopardy because Ain order
to be convicted of aggravated kidnapping he was required to also be convicted
of aggravated sexual assault, for which he had already been convicted, so that
he was twice punished for the same conduct.@








The Double Jeopardy Clause of the United States
Constitution provides that no person shall be subjected to twice having life or
limb in jeopardy for the same offense. 
U.S. Const. amend. V.  Generally,
this clause protects against (1) a second prosecution for the same offense
after acquittal, (2) a second prosecution for the same offense after
conviction, and (3) multiple punishments for the same offense.  Brown v. Ohio, 432 U.S. 161, 165, 97
S. Ct. 2221, 2225 (1977); Ex parte Herron, 790 S.W.2d 623, 624 (Tex.
Crim. App. 1990) (op. on reh=g).

A defendant has the burden to Apreserve,
in some fashion,@ a double jeopardy objection at
or before the time that the charge is submitted to the jury.  Gonzalez v. State, 8 S.W.3d 640, 642
(Tex. Crim. App. 2000).  Because of the
fundamental nature of double jeopardy, however, a double jeopardy claim may be
raised for the first time on appeal when Athe
undisputed facts show the double jeopardy violation is clearly apparent on the
face of the record and when enforcement of usual rules of procedural default
serves no legitimate state interests.@  Id. at 643.  When separate theories for an offense are
issued to the jury disjunctively, a double jeopardy violation is not clearly
apparent on the face of the record if one of the theories charged would not
constitute a double jeopardy violation and there is sufficient evidence to
support that valid theory.  Langs v.
State, 183 S.W.3d 680, 687 (Tex. Crim. App. 2006).  The fact that the jury=s
verdict could have relied on a theory that would violate the Double
Jeopardy Clause is not sufficient to show a constitutional violation Aclearly
apparent on the face of the record.@  Id.








Appellant did not raise his double jeopardy
argument in the trial court.  Thus, our
focus is whether a double jeopardy violation is clearly apparent on the face of
the record.  Gonzalez, 8 S.W.3d at
643.  The aggravated kidnapping
indictment alleged two alternative aggravating factors:  (1) the intent to use Adam as a shield or
hostage or (2) the intent to facilitate the commission of or flight after the
commission of aggravated sexual assault. 
We have already held that the evidence is sufficient to support
Appellant=s conviction under the Ashield
or hostage@ allegation.  Thus, a double jeopardy violation is not
clearly apparent on the face of the record. 
See Langs, 183 S.W.3d at 687. 
We therefore overrule Appellant=s ninth
point.

                                             Conclusion

Having overruled all of Appellant=s
points, we affirm the trial court=s
judgments.

 

PER
CURIAM

 

 

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  April 9, 2009